Case No. 13-5247 et al. State National Bank of Big Spring et al. Appellant. State of South Carolina et al. v. Jacob J. Lew and his official capacity as United States Secretary of the Treasury et al. Mr. Jacob for Private Appellant. Ms. Rorick for State Appellant. Mr. Tenney for Appellee. Mr. Tenney for State Appellant. Good morning. Yes, please. May it please the Court. My name is Greg Jacob and I represent Private Plaintiffs, State National Bank of Big Spring, the Competitive Enterprise Institute and the Sixty Plus Association. This whole question before the Court this morning with respect to the Private Plaintiffs is whether, at the motion to dismiss stage, the plaintiffs have adequately pled injury sufficient to establish their standing to challenge Titles I and X of the Dodd-Frank Act. Could I be clear? Only the bank is before us. Is that correct? It's the private party? All three are in the complaint, Your Honor. I understand, but who appeals? Only the bank. Is that correct? All three parties appealed. Only the bank is addressed in the briefing because of this Court's precedent in Grocery Manufacturers Association establishing that only one of the parties needs to establish standing. And so we focused on the bank as the easiest way to do that. The bank is injured by Title X and the Consumer Financial Protection Bureau because it is subject to direct regulation by the CFPB and has incurred concrete costs as a matter of reasonable and ordinary business practice because of the CFPB's actions and authorities. And that point that the bank is subject to direct regulation by the CFPB is of critical importance here as the government itself recognizes when at page three of its brief in trying to state or restate the matter before the Court, it suggests that none of the plaintiffs are directly regulated by the CFPB. The statement is simply false since the evidence in the record shows it's incorrect. This Court's precedents and the precedents of the Supreme Court have continuously recognized that an entity that is directly regulated has a great claim to standing and injury by virtue of that regulation. In Lujan, the Supreme Court said that where a party, quote, is himself an object, end quote, of the regulation, there is, quote, ordinarily little question, end quote, that that party has standing to sue. And Clapper, which the government almost exclusively relies on for its argument that the bank does not have standing, expressly distinguished a context in which a party is unquestionably subject to regulation. Within the context of that direct regulation, the bank is subject to three concrete here and now injuries that it has pled and submitted supplemental affidavits establishing. First, it incurs $9,900 a year in compliance costs to subscribe to the compliance alliance, which it subscribes to in direct reaction to the creation of the CFPB. Second, it is required by the regulations promulgated by the CFPB, specifically by the remittance rule, to tap the number of remittances that it issues in any given year and then to incur the cost to monitor the number of remittances that are issued. And third... Was it not monitoring the number of remittances issued before? It was not, Your Honor, because there was no reason to do so. There was no regulation and nothing flowed from the number of remittances that were issued. Now there is because of the CFPB. Do you have any record about the bank's business practice with respect to remittances, whether it's listed in a bunch of free services given to people with a certain kind of account or noted on a website as something that the bank will do? Is there any kind of part of the business plan at all in that kind of way? Is there any record on that? The declaration of Chairman Purcell talks about the bank's remittance practices, the fact that it offered them as one of the services available to its customers, and that now it has had to restrict the availability of that service to its customers, as well as... Nothing more specific than that. ...as well as evidence that it issued specific numbers of them per year and that it derived profits from that business. All that is in the declaration of Chairman Purcell. I'm sorry. Did you mention any kind of cost associated with that counting of the numbers of remittances? Yes, Your Honor. The CFPB itself expressly acknowledges the cost of doing that in its remittance rule cost estimate. So the bank says, yes, we now have had to cap and we are having to count, and the government itself acknowledges that there is a specific cost that we incur as a result of that. The third cost to the bank is that we have had to exit a previously profitable mortgage business, and we're unable to return to that business without incurring additional costs and risks imposed by the CFPB's regulations, as well as its UDAP authority. All right. So let me just go back. Number one is $9,900. Yes, Your Honor. That can't be enough. In other words, I'm directly regulated, so I hire a lawyer who tells me to subscribe to a service. That's not enough, is it? Your Honor, it certainly is enough, a cost of $9,900 a year, which is a concrete figure. You're not required to do it? As this Court recognizes. It's just prudent, but it's not a requirement. Certainly. It is prudent. It is something that the bank, as a matter of ordinary business. So you hire a lawyer, all right, because this new statute has been passed, and you have a client who wants to know about the statute. That's not enough, is it? There are probably many different ways that the bank could have. All right, but a $9,900 subscription fee, I just think, that's not enough. I mean, otherwise everybody could just come in. They'd just subscribe to this. Your Honor, we do not think that this blows the courthouse doors open. Well, you say the remittance rule, and I want to be clear, what is your position as to which complaint we are obligated to look at in determining standing? The second amended complaint. And what's your authority for that? At the time the complaint is filed, it's the standard that this Court uses to assess standing. And have you found the original complaint is different from the second amended complaint? There are. Have you found any authority from the Supreme Court or this Court saying we look not to the original complaint, but to the subsequently filed complaint to determine standing? We haven't found cases that directly address that question. Is it relevant here? In other words, if I look at your original complaint plus the Purcell declaration and maybe the Gregory declaration. Right. We don't think that it's relevant for these purposes. We did ask standing at the time the original complaint was filed. And in that complaint, we allege that we are injured not just by, for example, the remittance rule, which already was in place and is about to govern us. But in paragraphs 95 and 96 of the complaint, we say that we are facing... All right. So you're citing the second amended complaint to me now. I'm giving you the paragraph numbers from that complaint. That's right. And I just want to be clear whether your position is that in the originally filed complaint, you had sufficient... that you have made based on the originally filed complaint a sufficient showing of standing? Yes, Your Honor. This Court routinely looks to affidavits and declarations that are filed after the time of the original complaint to determine whether or not there is standing. This Court in the U.S. Telecommunications Association case asked at argument that additional affidavits be submitted and then considered those. In the Shirley case, dealing with... That's your strongest argument, that we have recognized that supplemental materials may be submitted to demonstrate standing. Repeatedly, Your Honor. And in the Shirley case, for example, after argument, the party that was... You can move on as far as I'm concerned on this issue. But I just wanted to be clear about that. Yes, Your Honor. We think that it's absolutely clear that all of that is before the Court for purposes of our standing. On the remittances, you said that the OCP had acknowledged the cost. I think you're referring to where the Bureau said that the cost associated with counting remittance transfers is lower than the cost of unnecessarily implementing the requirements of Subpart B of Regulation B. Is that what you're referring to? That's correct, Your Honor. Okay. So the cost is lower. I mean, it could be trivial. It could be near zero. But I guess you're saying having to do anything, having to walk from here to the desk across the room is something. And that's the basis for injury on the remittance. That's the record basis for injury on the remittance point. Well, we both have the declaration the Chairman Purcell as to the practice of the bank. And then we have the government saying that there is indeed a cost. And this is, in fact, very similar to what this Court addressed in the Duncan case where the Court said, here's the government recognizing in its statement of the regulatory costs that the cost here won't be significant. That's what the Court said. That's what the government said. And this Court said, hey, it may be not a significant cost, but that is a cost sufficient to confer standing. The precedents from this Court and the Supreme Court are legion, recognizing that the additional regulations that have come in that impose an unquestionable additional cost, for example, the requirement that the bank now has to impose escrows for any new mortgages that it would issue. That's one where that rule wasn't in effect when you filed your complaint. It was not, Your Honor. All right. So, and, of course, you critique the District Court for not addressing it. But I just want to be clear on, if I can jump here, on the mortgage point. The argument is made, well, those decisions, I mean, the act was passed and got out of the mortgage system. So is the stronger point that, essentially, there are barriers to reentry? I think that they're both very strong points. I know you don't want to give on anything, but in terms of, you only need to win on one. And I just want to see how strong these various points are. If they are strong, I should agree. Certainly, Your Honor. With respect to the mortgage market, we think that the barrier to reentry is very strong. In the Gratz case, the Supreme Court said an applicant who had not previously applied to the school because they faced a barrier in the form of what they alleged to be a discriminatory decision system was sufficient. Here, we have a much more credible claim. We participated in this market from the inception of the bank until the creation of the Consumer Financial Protection Bureau. Similarly, in Laidlaw, you had folks who said, hey, we used to swim in this river. We used to fish there. We're not going to do it anymore. They didn't have to prove that they had swum in the river and been injured by it. Rather, the risk that if they did go in, they could be injured by it was deemed sufficient. And the fact that they were refraining from entering the waters for that reason was sufficient to confer standing. Similarly, the Pelican Chapter case, where regulations impose additional costs. And again, this is a key point. The government keeps saying that it doesn't count unless it prescribes and prohibits you from doing something. And this court's precedents absolutely establish that the additional costs that you would incur and that the bank would incur if it was to reenter the market in the form of the escrowing, in the form of the additional risks associated with the escrowing, the ability to repay a rule, the kind of risk that this court recognized in both Rio Grande and Great Lakes is sufficient to confer standing because it affects your current valuation of your business practice. Mr. Jacob, are you contending that I think there's a distinction between – are you contending that events that occurred between the filing of the first complaint and the amended complaint can be taken into account in addressing standing? This court did exactly that in the Shirley case, where after the argument, the applicant filed a grant application that was considered and learned who their competitor was going to be. And it was filed with this court, and this court considered it there. The alternative doesn't really make sense. So the events arising wasn't just evidence of what existed at the time of the original complaint. It was actually events occurring post-complaint filing that just rise to standing and that might not have been present at the time of the initial complaint. It was a more concrete instance there of exactly the kind of harm that was alleged in that complaint. Similarly, in paragraphs 95 and 96 of this complaint, we say there would be all these risks if we were in the market right now because of the UDAP authority. Moreover, in paragraph 96, we say that the CFPB is poised to issue all of these regulations. These were about to spring. And these went into effect seriatim very shortly after that complaint was filed. These are simply instances of the imminent injury that, in fact, came to fruition very shortly after that complaint was filed. And that's exactly what this court did in the Shirley case when it considered that after-argument letter to the court showing an additional instance of the kind of competitive harm that it was alleging occurred. And out of time, the court wanted me to briefly address the Financial Stability Oversight Council. Yes. Why are you standing there? It seems like a flip of the usual competitor standing, which is under regulation of my competitor is harming me. That's not what you're claiming here, right? Here we believe that the record establishes two things, and that these two things are sufficient to establish competitor standing. First, it establishes that we do compete with CFPBs such as GE Capital in the kinds of markets that the bank sells products. The products are almost identical. What GE Capital offers on its website, interest plus checking, certificates of deposit, and agricultural loans, are all businesses that we are in disposal. Are there any allegations that you worry that the GE Capital has already benefited from the CIFI designation and or that you've lost any customers to GE Capital on account of that designation? Let me respond to both of those. First, in terms of the benefit to GE Capital, GE Capital did not appeal its designation and CFI status. That lends plausibility, which is what we need to establish at this stage, to our allegation that in fact it gives them an advantage. Any market benefit that you allege? Yes, Your Honor. Second, at Tab, at Exhibit 4, to my second declaration to the Court, it shows that the day that GE Capital was designated as a CIFI or targeted for specific designations of CIFI, its stock price went up. Third, as we allege, if the Court was to go to the website today, it's not in the record, but the website link is, it would find that the interest rate that GE Capital now offers for, for example, the Certificate of Deposit and its interest checking has gone down, which is exactly what you would expect in light of our... I know, but it could have gone down for all kinds of different reasons. Certainly, Your Honor. There are many that it could have been, but our duty has asked are there indications, and indeed there are indications. But connected to your client. Right. I mean, it's a tough thing to show because the market is very multiple determined and on days that it's not going, you know, down, it's going up and... Certainly, Your Honor. And this gets to, I think, a few precedents of this Court. In the Louisiana Energy case, there the harm to Louisiana Energy was that a competitor was going to be allowed to start selling at market rates, and it said it was going to sell at predatory rates. We didn't know what kind of rates they were actually going to sell at. This Court said, quote, we have not required litigants to wait until increased competition actually occurs. But to my original question, I think, tell me if I'm wrong, I think most of our competitor standing cases are where you're saying the agency has under-regulated, under-regulated my competitor. Here, the government responds, addresses our precedents, and says the consequences of the counsel's designations, I'm reading page 46 at the bottom, counsel's designations is to subject entities to additional regulation. The bank cites no case in which additional regulation of another entity has been held to be a competitive injury for standing purposes. So I'll get your response to that. Certainly, Your Honor. The allegation, and this is based directly on, for example, statements by Chairman Bernanke that a governmental endorsement of an institution that seems too big to fail confers an implicit subsidy because it is easier for that entity to raise counsel. So in essence, let me see if I got this. In essence, you're saying it's like a conferred benefit on a competitor that you think is an improperly conferred benefit, theoretically. Yes, Your Honor. I mean, to use the words of Chairman Bernanke, it, quote, creates competitive inequities, end quote, to have too big to fail institutions. I thought the whole point of this Act that I read was that we're not going to have too big to fail entities. Well, there are claims by some of those who favored passing the Act that that's what it does, and, of course, the countervailing claims that, in fact, it institutionalizes too big to fail. We have systemically important financial institutions that are designated, and we cited in our complaint legions of academic commentary and market commentary saying that this subsidy exists even with the presence of additional regulations that come through. I think the government's position is even if the government's standing up and saying and implicitly giving this subsidy through its backing, that that doesn't count simply because there are regulations attached to it as well. It comes with a carrot and a stick. But there's nothing in this court's precedent that establishes that that's the case. The record very clearly establishes the plausibility that a subsidy has been conferred, and it is the government that speculates that the countervailing regulation that comes into effect somehow outweighs and offsets that, but they don't set a single commentator for that proposition. The subsidy, just so I get it, because I get the concept that there were a subsidy, but my question's more factual. What is the subsidy again? The subsidy is that it lowers the risk to anybody that wants to invest in that particular institution. So let me give you one concrete example. If I am in Big Spring, Texas, and I'm deciding where I'm going to put my deposit, am I going to put it in GE Capital or am I going to put it in the bank? Well, before the Bad Frank Act was passed, I had the bank, which offered a very low interest rate, but it had FDIC insurance. It was incredibly safe. I was never going to lose my money. On the other hand, I could go to GE Capital. I could put my money into an interest-plus checking account there. I'd get a higher interest rate, but at a much more substantial risk that if GE Capital failed, I would never get my money back. Well, the day after Bad Frank passed, GE Capital became a more attractive option for me to put my deposit into because now, as I'm thinking about the comparison between the two, I'm thinking, well, wait, if GE Capital fails, the government's going to step in and bail them out. They've decimated them. And how do we know that? It's not a matter of certainty, and markets don't work on certainties with respect to the things that cause pricing to go up and down. I understand. You're just arguing plausibility here, and you have some academics who say this is so. I'm Chairman Bernanke, saying that it's so. In general. In general. Can you point me to where you mentioned, I think, an attachment to your second declaration? Yes, Your Honor. Exhibit 4 to my second declaration. I don't have the joint appendix, but I can provide it to you, Your Honor. Yeah, maybe. Where is it? 142 is my second declaration. My second declaration. My second declaration is at 190, Your Honor. And it's Exhibit 4 to that that has the article that shows all the share values going up in the wake of receipt designation. I don't think we have an exhibit. I may be missing something. I'm informed that the exhibit is not in there. I'd be happy to, it's certainly in the record. It's in the record. And I'd be happy to submit that to the Court immediately after the argument. Finally, the bank has standing to challenge the appointment of Director Cordray because it is subject to regulations that were enacted during the time that he was not appointed pursuant to the advice and consent of the Senate. And for all the reasons that we have standing with respect to those regulations vis-à-vis the CFPB, we also have standing to challenge Director Cordray. Unless the Court has any further questions. If we agree with you, you want us to reach the merits or not? On Director Cordray? If we agree with you on standing, we send it back. Do you agree with that? Your Honor, the issues on the merits have not been briefed yet. If the Court wanted to keep it and have briefing here, we'd be open to that. Thank you. Just making sure. Thank you, Your Honor. Patrick Weirich on behalf of the 11 plaintiffs states. Each of whom are large creditors of financial institutions subject to the newly created orderly liquidation authority. And as large creditors of those financial institutions, our rights, obligations as creditors with respect to these certain types of holdings are now governed by Title II of the Dodd-Frank Act rather than bankruptcy. Title II injures us in our capacity as creditors in a couple of significant ways. You said they're subject to the Dodd-Frank Act rather than the bankruptcy. But in most situations, they remain subject to the bankruptcy. Only in the very limited circumstances in which this emergency power applies would it displace the bankruptcy. Yes. I mean, when the orderly liquidation authority is invoked, that necessarily displaces the bankruptcy. There's sort of an idea built into the orderly liquidation authority that if we can't resort to the bankruptcy act rather than invoking the superpower, then we do so. First and principally, and this is where I want to focus, Title II of the Dodd-Frank Act has deprived the states the guarantee of equality of treatment as creditors. Now, the district court, relying on this court's 2006 Zivotofsky decision and its FOIA cases, recognized the deprivation of a statutory right, even if it can't be tied to any sort of quantifiable economic harm, can constitute a cognizable injury for persons of standing. The district court was nonetheless dismissive of this particular type of right because it's a right that protects us against a contingent future event. But if I might, by way of analogy, earthquake insurance is a similar right that protects against a unlikely future contingent event. If, for example, I had bargained for a $5,000 deductible as part of my policy and the federal government comes in and decides we're going to comprehensively regulate this insurance market and we're going to say that deductibles shall not be less than $10,000. As a holder of that policy, I would certainly be injured by that change in federal law that increased my deductible, the deductible that I had bargained for. And there, there would certainly be arguments that, hey, if you're in the District of Columbia, earthquakes are highly unlikely. You'll probably never need that insurance. Even if there is one, the damage may not even reach your deductible. You may never realize that sort of economic harm. But the right, the insurance policy that I hold, has been devalued by that governmental action. And in that scenario, would I have the right to come to court and raise any challenge that I might have to the legality of that governmental action? Now, we don't just, we don't just have to resort to these sorts of hypotheticals to understand what the state has lost. At page 25 and 26 of our briefing sheet, we cited a supplemental prospectus from a market participant, State Street Corporation, who in its prospectus to investors included a brand new warning that warned investors about the new risk and uncertainty that had been injected into this type of investment by Title II's displacement of the bankruptcy code. Now, as I understand it, under the bankruptcy code, you say there were only limited occasions when the equality principle would not apply. Yes, that's right. Is that right? And you acknowledge here that there's no way to know whether you come out better or worse. But we have to say it's plausible that you could come out worse. Yes, and the district court recognized that it's plausible that we could come out worse at this orderly liquidation authority. As they know well. Yes. But it certainly is plausible, and we cited some scholarship, the Cohen argument, that even the district court would like this. But I think a very good example is the State Street prospectus. I mean, they're required by SEC regulation to warn investors of the most significant factors that may be offering speculative or risky. And they've included this brand new warning in their prospectus to investors, warning them about this new uncertainty that is injected into this type of investment. Now, State Street's not in the business of scaring away its customers. It put that warning there because it felt it was obligated to do so to warn about this new risk. So the question becomes, is the injecting of this new risk factor into the investment that we bargained for in many instances prior to the implementation of Title II of Dodd-Frank, is that something of value to the state? Is that something of value to us now? Not just in the event that one of these orderly liquidations actually occurs at some point in the future. And it is. That's the core principle of the Bankruptcy Code. For over 100 years, the core tenet and principle of the Bankruptcy Code is that courts, U.S. Supreme Court, this court, and every other court, has recognized that concept of a quality of treatment of creditors. And that guarantee of the quality of treatment sort of defines the bargain that is struck between creditors and debtors. It gives you one anchoring point of certainty that allows you to determine exactly what sort of interest rate you might demand in exchange for extending this line of credit to the company. Here. It would be great to have in the record where, for example, what you say to about State Street Banks' prospectus, is that in the record? It's at page 25 and 26 of our brief in chief. I guess what you're asking is the prospectus part of the joint appendix. Is there anything that's actually in the record just to bolster the notion that you're in that current realm? No, that prospectus is not part of the joint appendix, but we did cite to it at page 25 and 26. And we also cited to a white paper from BlackRock, also warning its investors about these metrics. So the district court, while she recognized the deprivation of a statutory right, even if it doesn't result in a concrete quantifiable economic harm, can constitute an injury in fact, but she nonetheless held, and she said that this case was different from the Zivotofsky case, because in her words, in this case, no violation of any statutory right has occurred. Well, we have an in-bank case, Florida Audubon, where the court was talking about a long chain of events and all these different actors who have to act in a certain way, and who knows how they're going to act. And I read the district court's opinion to essentially be alluding to that notion, and of course the government's brief references that as well. How do you respond? My response is the response that we gave to their citation, which is yes, if we're talking about the potential additional economic harm that we might suffer in the future, if the orderly liquidation authority is in place, then yes, that would be a relevant thing. But what we're talking about is have we incurred a loss now? But isn't that a fortiori? Yeah. The market can only estimate a loss, it's predicting a loss that you're going to meet in the future, and there's further uncertainty when you're trying to operate now in a market that values that future risk. And the problem for us as a court is that we want to recognize, we must recognize the standing of things that are harmed, but there also is a limit, and that we're all market actors, in some way we're all affected. Everything you own, every investment you have is in some way affected. So does that mean that we throw the door open and anyone who wants to can come to court to challenge the authority? No, we don't believe that. While there may be a large class of creditors who are affected, we are talking about creditors who are large institutional investors to the tunes of billions of dollars, these state pension funds, in these specific type of debt holdings, that in companies that are subject to the orderly liquidation authority. I don't think we're situated quite like the consumer investor. We're not situated like individuals that would expand this class. Well, the individual investor bought this investment, just like your client bought investments, and potentially they may be creditors somewhere down the road, provided a series of events happen. It's possible that an individual could show that it's an investment, perhaps a mutual fund that has that type of holding. And it's possible that the value of these assets has increased after Dodd-Frank. That's what I just need to be clear about this. I mean, you cite, you say in your brief, an article, two articles, or two perspectives. But is there any showing that there has been any effect? I mean, I know you cite Clinton versus New York. That's pretty strong in your favor, but still, there was a tighter fit, wasn't there? Well, two responses. One, we're not like the individual investor. We're the direct counterparty in this contract. You're the pension fund. Yes. Right, who bought various investments. Secondly, the question of whether those investments have increased in value or decreased in value, is irrelevant to the question of whether the loss of the security that we were given, as a result of this guarantee of performance or treatment. And I think that's the United Trust of New York. Now, that's impairment of contracts. It was an impairment of contracts case, but I think the court's analysis there with regard to whether there was an impairment of the contract is analogous. So suppose, in fact, in a hypothetical, the pension funds gained 10% once Dodd-Frank was enacted. Would we be in the same position? We would be in the same position. And we'd be making the same arguments, wouldn't you? So it has nothing to do with the value, actual value, of the client's investment. Nor did the actual value of the bonds in that New Jersey and New York case matter to the Supreme Court in determining whether the contract had been impaired. There, the court said, the fact is that no one can be sure precisely how much financial loss the bondholders suffered. The court noted that the bonds had retained their A rating. The court noted that the bonds had regained their price position in the market. And suppose, in the hypothetical, your bonds were rated B, and Dodd-Frank is enacted, and they're rated A.  Some? Yes, there may be some benefit to the state, but the issue is whether the additional risk factors, the participants in the market like State Street, like the scholarship is recognized as present. And the issue is it is, regardless of the valuation of the investment asset. The issue is whether the deprivation of that, just like the loss of the guarantees that the bondholders have in the New Jersey and New York case, eliminated what it said was an important protection that those bondholders have. Even if elimination of that protection didn't result in devaluation of the asset. You mentioned State Street a few times, but I think that State Street, if this is what you're referring to, it's a little bit less clear about identifying that there's risk. I think that State Street said that it could one day be in receivership, and the law is different under Dodd-Frank. It doesn't really identify that there's a substantial risk in the market as a result of that, but just that that's a new legal wrinkle. And they also stress the uncertainty. While the FDIC has issued regulations to implement the orderly liquidation authority, not all aspects of how the FDIC might exercise this authority are known. Additional room is very likely. It's uncertain. It just doesn't seem to say, harm now, watch out. But rather, we've got this new feature on the landscape. That uncertainty is precisely what they're warning the investors about. That's the new risk in the investment. There is uncertainty. Before, I could have told you if you purchased this particular type of debt obligation, we know how you're right. The whole background of the Dodd-Frank Act is there could be global economic meltdown. And people know that. And so this is a situation saying, if we get to that point, and so I don't really read this as saying, feature on the landscape. There have been regulators at work dealing with the lack of tools that the government thought it faced when we last had a global economic crisis. And these tools are now in place. There's uncertainty about how effective they will be. Right, and there's a reason they're notifying their investors about that uncertainty, because they have obligation under SEC regulations to warn about significant risk factors, right, things that might make the investment risky, things that might cause them to get sued down the line, if, in fact, they fail to warn about those risk factors. So I think the inclusion in the prospectus of this brand-new warning relating to Title II is important. But I think what you're getting at is perhaps sort of notions of, well, there are things that may develop down the line. And this goes to the district court's conclusions about rightness, which I want to touch on briefly since my time is short. The district court there said that there may be further factual development that might sharpen this issue, but it didn't identify any of those factual issues. And, again, the analysis turned on sort of the potential future injury that we might have, additional injury if the orderly liquidation authority is involved. But with respect to the injury that we live has occurred now, at the moment we're deprived of the quality of treatment, there's no further factual development that will help sharpen the issue for this court's review. And, secondly, the court is required under the Abbott Laboratories test to take into account the hardships to the parties of declining to review the issue. I thought she was also talking about the fact that many of the regulatory measures were not even in place. There are additional regulations that will, I think, sort of sharpen what the orderly liquidation authority is going to look like when it is invoked. But what those regulations won't change is that we have been deprived of the bankruptcy code's guarantee of a quality of treatment. The Title II says now they can step in through the orderly liquidation authority and treat those dissimilarly. And your bonds are today worth less now as a result. They are riskier investments. And, again, we don't have to look at this in a vacuum. We know what happened to Indiana's pension fund and the Chrysler deal. That's what happened to them. And if you require us to wait until the authority is actually invoked in order to seek review. I'm not doing nothing of that. I'm just looking for the kind of factual substantiation of the argument. You might have followed your argument perfectly clearly. But your bonds have not been shown to be less valuable since that time. Yes, I mean, so the question is, have we made a plausible allegation that there's been some devaluation? If your question is at the summary judgment stage, if the district court requires us to make an additional factual claim, could we do that? We'll certainly try to make that shown. The question is, what do we have on the record? One, we've pointed you to the warnings from the market participants, like State Street. We've pointed you to the scholarship, which recognizes this new risk and uncertainty. But more than anything, I just want to appeal to sort of the intuition that we have. But if you're the holder of a – I assume your bank probably has a mortgage like mine does on my house. It's a first mortgage. If the government were to come in and say, that first mortgage, it's now a second. Now, you could say – they could argue up and down and say, look, Judge, you've done excellent credit rating. You've never missed a payment. The odds of you defaulting on this obligation are virtually nil. But the bank is still going to jump up and down and scream and shout and say, we lost something of value. That priority status that we had that guaranteed that we would be first in line has been taken away. It may never result in any economic harm to us, but it mattered to us as a predator. That's really what has happened to us here, and that's what we're asking you to recognize. But going to the hardship point on the rightness analysis, each day that goes by is a day where just down the hallways, in the district court here, pursuant to Local Rule 85, the orderly liquidation authority could be being invoked in a courtroom in secrecy with no notice to us as predators, in fact, with criminal sanctions against those that they told us it was going on. And at that point, by the time we got notice and by the time we tried to bring a claim like this, one, we run into a couple of hurdles. One, the statute says we can't challenge the constitutionality of the orderly liquidation authority. Now, even if you disagree and say, well, the Congress can't bar us from hearing the merits of the constitutional claim, we know that the government is going to argue that that statute effectuates a sweeping ouster of your ability to review the statute, because that's what they argued in the Perry case. But even if we get there, at that point, it's already happened. We're trying to unwind. Even if we prevail in the constitutional claim at that point, we're trying to claw back the money rather than get it. It's gone. And the harms are much like the harms that Indiana faced. But ultimately, the courts found that its claims were moved. It was too late. It couldn't recover. And that's what we're trying to avoid here. We've been injured now. The case is dry. Thank you. Thank you. All right. Counsel for the government. May it please the Court, to start with the Consumer Financial Protection Bureau issues. Usually when you're bringing a pre-enforcement challenge, the standard is that you have to demonstrate that there's conduct in which you intend to engage and that there's a credible threat of prosecution. And I just want to sort of start by illustrating how far we are from that in this case. If there were an enforcement action to be brought against the bank that we brought by OCC, it would not be brought by CFPB. CFPB is statutorily barred from bringing enforcement actions against entities of the size of the bank. So then they turn to, okay, well, there are some regulations that they say are affecting them. One of their arguments relates to regulations about unfair or deceptive or abusive acts or practices. There are no such regulations yet. Then they have the remittance rule. That's one of their main focuses. So the remittance rule says that it applies only to entities that do these remittance transfers in the normal course of business. That's been defined as at least 100 transfers in a year. So then you can look at the record. They submitted a declaration. The declaration said that they only gave one specific figure, which it said, and this is a 104 of the joint appendix. It said in the year ending, you know, 12 months ending in 2012, there had been 18 transfers that they were certain qualified and then eight more that they thought might have qualified. So that's 26. So the fact they've never done it, they have to say what? What they do say in the declaration is they want to continue to issue these things and they want to continue to grant them even when it exceeds 100. Well, what they said is they want to keep granting them to anybody who asks for them. And then they say, we know we have one data point, 26, in one year. And then they say, you know, it's not always the same. It's gone up and down. It's gone up to as much as 70. So we're talking, so then they're saying. So tomorrow a big client comes in and wants 100. Well, I don't think that's the way these things work. If they had allegations that that was likely, if they had an allegation that said, you know, we're expanding our portfolio, we're expanding our business, we're entering into new markets, we want to do more and more of this, it was 26 this year, then it was 35, then it was 50, then it was 70, then it was 80, then it was 95. Well, they're in the business to make money. But if you think about just, if you were coming in and you were saying, we're afraid that you're going to enforce this provision against us. Now, we recognize that we've never gone over 100. We've never come anywhere near 100. The only data we've got says that we had 26 in a certain year. And, you know, we have no specific intention to go anywhere above 100. The idea that you could come in with a pre-enforcement challenge, it's just impossible. Hold on there. They're already complying. They're doing, they're counting. And it's probably a pretty small cost to count. But they're claiming, you know, we have to count. And they're claiming that in your, in the Federal Register, you said that it would be less costly to count and make sure that they weren't over 100, that would be to comply with the regulations applicable to banks that do this in the regular course of business. How do you respond to that? It's small, but is it concrete? Well, there's a few points to respond to it. One is that there's nothing in the regulation that says that this particular bank has to count. And so, you know, obviously you could be talking about someone who's a lot closer to 100 than they are. But just to take the legal point, you know, this is one of the ways in which the Clapper case plays into the arguments today, which is that Clapper stands for the proposition that by taking steps, that even if you think they're reasonable steps, and the Court may judge that they're reasonable steps to avoid an injury and the injury is not, if the injury that you're seeking to avoid is not itself sufficiently impending to be a basis for standing, then you can't, in the Court's words, manufacture standing by taking steps to avoid that risk. So the thing we should be focusing on here is not what they've done and whether it's reasonable to do it, but the question here is if they've done nothing and if they were just saying, we're worried that there's going to be an enforcement action against us because we're going to go over 100 some year, would that be enough for standing? I think that's not what they're saying. I think they're saying, we're having to count. We're injured now. But they're not being, there's no requirement that they count. They can't be. Well, you have a regulation that says we can't go over 100. That's pretty easy to do. We have many hundreds of customers. You know, a couple of workplaces that have relatives abroad, you know, you can quickly do that. So they're saying, we're harmed. This is the reasonable and predictable impact of our regulation. Well, there's a factual response and a legal response. On the facts, another thing to note in the regulations themselves is that there's sort of a State Harbor compliance period. This is on 29 to 30 of our addendum. That's where the regulatory provision appears. So that if you work previously over 100 and you go over 100, you get a reasonable amount of time not to exceed months to come into compliance. So that just sort of emphasizes the distance that we are from, you know, one day they go over 100 and then the regulators come barging in. But on the legal point, what the Supreme Court was talking about in Clapper, there, too, they were saying, look, there are steps that we're taking now. We think they're reasonable steps. There's this injury that's out there. It's not ñ it doesn't get us all the way to the hurdle of passing standing, but there's an injury to us now in the sense that, you know, we have a legitimate concern about this. And so we're taking these reasonable steps. And those steps themselves have a cost. And the Supreme Court said flatly, no, not good enough. We don't look at what you did in order to avoid an injury that was not itself sufficient to qualify for standing. In Clapper, didn't you overrule the basic divide that pervades standing law, which is if you're the object of the regulation, as Lujan says, we have cases like that every day where we don't even query the parties on standing because they're the object of the regulation. It's obvious, as Lujan said, that they have standing. So there's a big divide between the object of the regulation, not the object of the regulation. All the tough cases, or most of the tough cases, are where someone who's not the object of the regulation is coming in and complaining. And that's where all the speculative and chain of causation issues arise. When you're the object of the regulation, it's easy, right? Well, let's be clear about what it means to be the object of the regulation. When your activities ñ when the activities you engage in as an entity are regulated by the agency, often it's the regulation in question we're talking about here. Obviously they have a different kind of challenge, but they're a regulated ñ do you agree they're a regulated entity? Well, the activity ñ just to be specific about the activities that they engage in. We can start with the remittance rule in particular and then go to other activities. Usually what it means is not that you are operating in the sphere in which this regulatory organization regulates. Usually what it means is I'm doing something and the regulator is telling me what to do or not do. So the remittance rule, to be specific. The remittance rule has these disclosure requirements. If you're going to do these remittance transfers, you have to give certain disclosures to the people who are doing them. It's a sort of consumer protection measure. Now, does the bank have to give these disclosures? No. Why? Because the regulation only applies to people who do more than 100 in a year, and they don't do more than 100 in a year. If they want to do more than 100 in a year, they'll have to do the disclosures, right? And they engage in the activity that is being regulated, correct? But if they allege in their complaint, plausibly, that they, but for the regulation, they would want to go over 100 in a year, we would have a very different case. But what we're talking about here, you know, if anybody engaged in 100 in a year. Just to be clear, when you say different case, you mean they would have standing in that case? You know, depending on the quality of the allegation. But if they had a plausible allegation, but for this regulation, we would do over 100 in a year. We're not doing over 100 in a year because this regulation is putting us to the choice of complying with these requirements or not doing that. Yes, they would have standing. They're not the object of the regulation because they aren't someone who does remittances in the regular course of business. They aren't. And that's what the regulation applies to, but someone who does remittances in the regular course of business. Exactly. And, you know, they haven't alleged that either that they are such an entity or that they wish to become such an entity. Can I ask you about some of the other requirements? You were going to go into the other rules, by the way, so I'd be interested in that. Yeah, that's what I was going to ask about that, too, and particularly about this original complaint question, whether a standing can arise after the complaint is filed and how should we measure that. And, you know, there is this rule about jurisdiction being measured at the beginning of the case, mostly in cases about diversity. I just wonder if you have cases that speak to whether we have to look at the first complaint or whether the amended complaint is the one we should look at for assessing the standing. I don't have specific cases in this particular posture. It is true that the normal rule is that you have to have standing at the time that you first file the case and then maintain standing throughout. We don't think that their standing materially changed between the original complaint and the amended complaint, so I'm not sure the court needs to address the matter. Suppose we do. What's your answer? I mean, the usual rule, and they haven't said anything to suggest that there's a difference here, is that you have to have standing when you initially file the complaint and then throughout the course of the proceeding. So the district court, I think, pointed out that to the extent that they're relying on things that transpired, not evidence that they submitted after the complaint was filed, but events that transpired after the complaint was filed, then that's a problem for them. But just to say one more word about what it means to be a regulated entity, and then I'll turn to the other rules. So this case is not like a case in which we have someone we know they're subject to the rule and so we don't ask about their standing. Like in the American Library Association case that we cited in our brief, that was a case related to pornography, and they were saying, you know, there are certain materials that we want to put out there. We're worried that this, in that case, criminal statute is going to prohibit us from doing that, and so we have standing to challenge the criminal statute. And the court looked very carefully and said, all right, is it actually true that there's a threat that the particular things that you're doing or you say you want to do are subject to the provision that you're seeking to challenge, and is there a credible threat of prosecution? It didn't say, oh, well, this is sort of a thing about sexually explicit materials. You do sexually explicit materials, and so good enough. And that's sort of what the bank is asking for here. Now, in terms of the other rules, I mean, the main other thing that the bank is relying on, besides the remittance rule where they're not close to the 100, is their exit from the mortgage market. And so the real question is whether they adduce sufficient facts to plausibly allege that the reason they're not in the mortgage market today has to do with the CFPB. That's really what they're saying. They're saying, if it weren't for this mean CFPB, we would be in the mortgage market today. And so then you look at the facts. So they got out of the mortgage market in 2010, when obviously there was a lot going on in the mortgage market that had nothing to do with CFPB. Then CFPB at that time hadn't put out any rules that are relevant here, basically hadn't put out any rules at all. CFPB, we know, wouldn't be the entity I would engage in enforcement actions against if they were to re-enter the market. That would be OCC. And so then they sort of picked out a few rules. They've got the ability to retain rule in which CFPB loosened the standards for small banks in terms of getting a statutory presumption. They've got this escrow rule, which came out even more recently than that. And I'm not sure on these facts that there's really anything you could do to bolster this, to establish that the reason you're not giving people mortgages today is the CFPB rather than a host of other factors. But if you were going to try, you would have some facts that you alleged, plausibly, that said, you know, our business model is thus and such, and, you know, it would be very profitable if we didn't have to comply with this and this and this, or this specifically is the thing that CFPB is doing or alleging to do. What we have instead, and we have, you know, cost-benefit analogies, but the company would have some evidence that they were actively considering going to... Well, I think maybe it's a big issue. We're pleading here, and we're talking about standing. And on the foreclosure rule, they sort of say that they have Texas, and if you have the Texas rule, you can foreclose really quickly. And one of the things we did in our business plan is we used that as a kind of a stick. You know, we told them, look, you're going to face foreclosure if you don't come current. And people come current pretty quickly. And if they have a rule now that says 120 days, they're saying, you know, we have to wallow around and lose more money. It just looks like a different business plan to us. Well, I'm not sure they actually alleged all of that, of what they said was that at some point in the past they have used this provision. But even if you attribute to them the statements that were just made, you know, what we also have, and this was subject to judicial notice because it's their own filings, the number of their loans that were either foreclosed on or even in default for like the five years before, you know, relevant from like 2008 to 2012 was zero. And you would think you would want, if you were going to say, and then just on the merits in terms of a particular borrower, what you're saying is, you know, the difference between foreclosing in 20 days or commencing the foreclosure procedures in 20 days and commencing them in 120 days, that is what is making the difference for even if they had defaulting homeowners, which it's not clear that they do. That is what's making the difference between them, you know, coming up to the department on their mortgage on the one hand versus not coming up to the department on their mortgage on the other hand. They certainly don't have any state, you know, forget evidence. They haven't alleged that there are people for whom that's the case. I mean, if they came in, for example, and I don't think this would be enough, but it would certainly get them closer. If they came in and they said, for example, in 2010, you know, we had the mortgages of John Jones. We were worried that John Jones was not going to become current. We used the great Texas procedure that is now precluded, and then, you know, the next day John Jones sent us a check. If you allege that, you're certainly getting closer. I'm not sure that gets you all the way there. So saying it's been a useful tool is not enough? Well, that's so general, and it's not time-specific. It's not person-specific, and it's just so far from actually saying. I mean, for all we know, this was in 2000, you know, with one person, and we don't know why they did it, and we don't know whether they're ever going to do it again. We don't know what the consequences were. We also know, as the district court noted, that, you know, they have exited the mortgage market, and so they have a small and dwindling number of remaining mortgages. So if you're talking about the likelihood that they're going to want to use this tool again, you would certainly, at a minimum, need a lot more allegations from them about, okay, we've got, you know, here's how many people. They say they want to reenter. They do, and that goes back to the point that I was making. They have to plausibly allege at the fleeting stage, and they've also had an opportunity to submit declarations. So, you know, they've had a little bit more opportunity here. But for the CFPB, I don't know if they would try to identify some action or just the specter of the CFPB. I'm not sure exactly what it is. It's this battery of rules. I think they're saying that. The F-rule, the K-rule. I think they do allege we would reenter the mortgage market, but for these rules. They say that. The question is whether it's conclusory and whether it has to be presumed true as plausible. What's wrong with just saying it? Well, it's not going to be a plausible allegation. Well, how do you know it's not plausible? Do you think they're lying? I think they don't have – usually when you have something that is sort of the ultimate thing that you're trying to demonstrate or close to it, you need to have other facts to bolster it. You just said earlier if they had alleged we would do this but for that, it would be okay. And Judge Pillard points out they have said that, and you're now saying, well, it has to be plausible. So how do we figure out in which means? Are they telling the truth or is it otherwise so objectively impossible that we can't credit it? So just to be clear, you're saying it falls on this one? Yes. I mean, as to the – just to be specific about this because I want to – when I said, you know, I don't think I meant previously to suggest that, you know, if they sort of talked around a little bit more that would get them all the way there. Just to look at what we actually know as fact. What we know is the time they exited the market in 2010 when CFPB had done nothing. Then there are a few rules that have rolled out over the ensuing period, some of which are beneficial to them, some of which they regard as troubling. So you can take them at their word that they regard the troubling ones as troubling. If you're trying to get over the barrier to a plausible allegation that but for CFPB we would be in the mortgage market, you would want at a minimum an – How could but for? Can it be CFPB as a factor creating a headwind that makes the mortgage market unattractive to us? We're talking about standing injuries. I don't think that would be enough because the point is that what you're supposed to show – I mean, this goes to a regressibility point. If, for example, this court issued an order or the district court issued an order abolishing the CFPB and then they still didn't enter the mortgage market, then that would demonstrate that they didn't have regressibility. So you really do need to show that it's the CFPB and not something else that's stopping you from going back into the mortgage market. And if you look at – if you just look at these rules, these rules – I mean, and the fact that they exited the mortgage market in 2010, they haven't explained what's changed between 2010 and now. I mean, they can't say some rule that was promulgated later was the reason they originally exited in 2010. So they have to say, okay, we exited in 2010 for some reason. That reason's not true anymore, but now we're coming back – we would come back in except for CFPB and all of these things. It's sort of hard to put together the story of exactly what's going on here. And you do need to – in order to have standing to challenge agency action here or, in this case, a federal statute, ordinarily – I'm not saying – and that's another thing to remember about this case. We're not saying it should be so difficult for someone to come in and challenge CFPB, somebody who's subject of an enforcement action, somebody who actually engages in conduct that the CFPB has said is impermissible or has to be done differently could come in and raise all of these challenges. What we're talking about here is an entity that has not established that there is anything that it wants to do that is prohibited by CFPB. And that really is, you know, a problem for standards. So their argument, in part, as I understand it, is we were in the mortgage market. It was very profitable. Then Dodd-Frank was passed. We got out of it because some of the things we were doing were probably going to be a problem under Dodd-Frank. But we'd like to get back into the mortgage market, but we can't get back in the way we would like to get in because of these rules. Well, I mean, first of all, it can't be Dodd-Frank will stop. It has to be the provisions of Dodd-Frank that they're challenging. So, for example, the ability to repay statute is something they would have to comply with either way. But my point is they don't have to wait until they receive notice of an enforcement action. They don't even have to, or do they, have to wait until they receive notice that they're being investigated in connection with a possible enforcement action. So your point is they can't just say as a general matter they'd like to get back into these rules. What more do they have to say? They have to plausibly allege that if it weren't for... Here's my point. They were making a lot of money off their mortgage business. So they want to make more money again, and they would get back in it. But in their view, these rules present obstacles to their re-entry. Well, I mean, just in order to make that plausible, just to take one simple angle on it. So when they exited the mortgage market, there were no rules. So they could have, you know... One thing that would be helpful to hear an explanation of is why they didn't remain in the mortgage market until the rules came out, and then they could exit when the rule that was... Well, they made a prudent business decision that some of the things they were doing were probably going to create problems for them after Dodd-Frank was enacted. I mean, that was a game-changer. Well, Dodd-Frank... I mean, first of all, there were lots of game-changers in the mortgage market in 2008, 2009, 2010. True, true, but this was one of them. And Dodd-Frank was one of them, and then... So you've got a subset of the game-changers, and then within Dodd-Frank, you've got rules that are going to be issued by CFPB. You know, their statements about how CFPB is going to be going after people really don't apply because OCC is the one regulating them. So then you've got... And then, you know, you can look at the specific rules they've identified here. I mean, you know, the thing about ability to repay was CFPB was given authority to give a presumption to balloon loans where the statute had none, and they said, we give a lot of balloon loans. And CFPB issued a rate that was more, you know, more generous to the banks than the statute. So they should have said that these rules convince us that we can't make money if we re-enter the market. For example, we've lost the benefit of the Texas rule, we've got to wait four months, we could just lose a lot of money over that course of that time. Is that the kind of thing you want? I mean, I think they would say that their single statement that they would re-enter does this, but if you try to start fleshing it out a little bit to help the court assess whether it's plausible, I think one would quickly discover that it's not very plausible. So they would say, okay, you know, here's the fundamentals of the mortgage market, here's why it's still great for us. We got out in 2010 because we were afraid that CFPB was going to start putting out rules, even though they hadn't done so yet. And then lo and behold, they came out with this rule. There's the four-month, 20-day thing. There's the ability to repay thing. We thought it would have been a little bit better for us. It was actually better than the statute, but we thought it would be still better for us. We've got, you know, the escrow rule that came into effect, you know, very shortly before the district court's decision. And if you sort of – if we were out from under those rules, then, you know, the mortgage market would look great for us. But, you know, we've got these rules here, and because of that, you know, this very profitable market we're just not going to bother with. That's basically their allegation. And, again, it seems very hard to flesh this out in a way that would make it plausible, but in order to get started, you would at least want an explanation of why you had to leave in 2010 before there were any rules, what's changed between then and now, other than CFPB putting out some rules that may or may not be as bad as what they imagined, but certainly aren't sort of, you know, game changers, to use the court's phrase. And so that's really the problem with that, that you have an entity coming in that had not established that things would be different for them if they got the relief that they were asking for. You may not have a position on this, but DeSantis had asked, you know, on this appeal it's just the bank and the others are here kind of on their hotels and there are grocery manufacturers versus EPA precedent. Do you have a position on whether that makes sense? Like what role do people without standing have in a case? I mean, I think you could, I'm not sure I have a blanket categorical answer. You know, to the extent that they're filing joint briefs and, you know, submitting joint readings to the courts, there hasn't really been, the issue hasn't been joined. If you got back to the district court and then, you know, different parties wanted different discovery, then that would be something that could pose a problem. For now, the only point that we're making on that is that we agree with the plaintiffs that if the bank has standing the case can go forward. If the bank does not have standing, as the district court properly concluded, then the case is over, you know, on the provisions challenged by then and then you've got the state, you know, with the same setup. And so at the current stage of the proceedings, that is sufficient. I recognize my time is over. I haven't touched on the other two titles. I mean, there's sort of a common problem to both of these in terms of standing, although the particulars are different, which is that they really, they're talking about something that not only do we not know exactly how it's affecting them in the state's case, it's very unlikely that it would ever affect them, but we don't even know the direction of whether it's good, what has happened is good for them or bad for them. And that's very different from the cases that we're relying on. So to talk about competitor standing first, you know, in competitor standing what they're saying is there's a statute, the Financial Stability Oversight Council was specifically set up to eliminate the perception that the government was going to come in and bail out entities. That was one of the statutory goals of the council. And what the council actually does is designate entities for additional regulation over and above the regulation that would occur if they hadn't been designated. And so their claim is, well, that is a sufficiently good thing for those entities, those more regulated entities, that it benefits them to our detriment. And, you know, they have studies that suggest that being perceived as sufficiently large and interconnected that the government might be concerned if you were going into default, you know, might be seen as a benefit. We would submit that that is not something that was caused by the provisions at issue here. But anyway, so they have... So explore this as your... Let me step back. If the government or an agency confers a benefit on a competitor, that's competitor standing. I mean, that's full stop. In the already case, the Supreme Court said you don't have competitor standing just because the government has conferred a benefit on a competitor. What this court's cases on competitor standing have recognized is that if... Some of the case law is just sort of... If it's sort of basic economics, if you're saying, we're in this market, you're bringing a new competitor into our market, then, you know, that's likely to be good enough. And then, of course, if you can establish that there was an actual change to your circumstances based on what happened, you know, they came into the market and then our, you know, our customer base also led to that. If you're a competitor and you say... If you're a market entity and you say my competitor is no longer being subject to certain environmental regulations that they should be subject to and that's helping them in the marketplace, usually that's the kind of theory that gets competitor standing. But that's really not where I want to focus. I want to focus on why don't you think this confers a benefit of some kind? Well, I mean, the question... You're a competitor. Well, I mean, first of all, there's sort of a gross benefit or a net benefit, which is a relevant question. But, I mean, if it confers any benefit, it's certainly not a huge benefit because the benefit that is being discussed is that investors will recognize that this company is sufficiently large and interconnected that its default would threaten the financial stability of the United States. And for an entity like GE Capital, which is the one that they're focusing on, and we've cited some materials, I mean, they're relying on a Bernanke statement that was issued before any of this happened. So we're talking about the delta between sort of everybody kind of knows that these guys are largely interconnected on the one hand to the government, you know, the Financial Stability Oversight Council formally designated them on the other. Then if you look at the flip side in terms of the harms to the entity, and this is where I think this court's cases are useful in making this distinction where there are sort of countervailing factors and you don't know whether it's a benefit or a harm. In United Transportation, this court was considering a circumstance where you weren't going to be required to get an explicit permit for a certain kind of railroad configuration. And the plaintiffs were saying, well, that's going to harm us. And then the court said, okay, well, there are theories on which that would harm you, but there are theories on which that would help you. There are sort of things about this that might be good for you and things about this that might be bad for you. And while we'll give it to you in a case where, you know, the direction is obvious and the fact of it is obvious, you know, here we're really talking about speculation and that's not going to be good enough for standing. And that's really the issue that we're talking about here. I mean, it's not – it's far from intuitive that saying you now have to comply with additional standards put out by the Federal Reserve Board and comply with statutory remediation requirements, you know, now your competitor has to do that. And it's not – it's far from self-evident that that will – I mean, it's far from self-evident that that's even a net good thing for the competitor. And as the district court pointed out, some of these entities have challenged their designation, so they obviously weren't that excited about it. And then even if it was a good thing for them, then under the already case, the mere fact that something good happens to your competitor isn't enough. You really have to show a nexus to what's happening to you. And this court's case is fair to that, too. In the current case, for example, cited in the brief, you know, there was a regulatory action against the competitor that was foregone, and the court said that's not good enough. You know, even if – you know, even if we know that it's a good thing for the competitor not to be subject to this regulatory action, that's not good enough to say that it really affects you. And you will agree it was also a circumstance where they said something good happened to your competitor, but the nexus between that and something that would actually affect the entity before the court was just not clear enough. So that's the problem with the competitor standing. Now the states, you know, have that problem in addition to some other problems because, again, for the states, it's not the least bit clear that ordinary liquidation authority at the end of the day is worse for them than ordinary bankruptcy would be. And, again, the point of this was to let the FDIC step in and protect. Well, in their case, it's eliminating a statutory right that they possessed. And I think it's going to the earlier point. I thought that was a well-recognized basis for standing that wasn't all that complicated. If you have a statutory right, it's eliminated or changed, altered, affected your standing. They gave hypotheticals about the earthquake insurance, the mortgage hypothetical, and those do seem useful hypotheticals. Well, the problem with the hypotheticals is, again, that's the respect in which the problem with their argument is similar to the problem with the Financial Stability Oversight Council argument, which is that in the earthquake hypothetical, you know the direction. The difference between the two, just to beat this horse, is in one, you're the one who has the right. In the other, you're complaining about the regulation of someone else. So it's much harder in those cases to establish standing and you get into all this. But I think when you have the right, I have a statutory right to do X, and all of a sudden I'm told, no, you don't have the statutory right to do X. Well, just to be specific about the statutory right. Right. You can point out what's how I framed it there. They don't have a statutory right to do anything right now. They're not being forced to do anything differently. But if you just think about the mortgage hypothetical, for example, I mean, the reason those cases seem like better cases, and they are much better cases, is that in that circumstance, the value of what you have bargained for has changed. I paid good money to get a $5,000 deductible, and now you're telling me I have a $10,000 deductible. And you could either demonstrate that the value has changed or it would be sort of intuitive that the value has changed. And if the states were in here saying that they had alleged and they could demonstrate that the bond prices, it would be $100 but for this, but now it's, you know, $98 or $102, whatever is better for them in a particular scenario, then, you know, that would be, then they would be, they would bring themselves closer to the mortgage hypothetical. But they haven't, and the district court pointed this out, they haven't alleged that the economic value today, and the four hypotheticals in my colleague's argument made this clear. They're not saying it's worth less. In fact, they're saying, for all we know, it's worth more. But we still have a statutory right. And then you say, okay, what is the statutory right? And then the statutory right is if there's another financial crisis and if two-thirds of the Federal Reserve Board, you know, if there are these recommendations, and then if the FDIC does this, and then if this other thing happens, if the FDIC decides to exercise this authority, if they decide not to treat similarly situated creditors similarly under the authority that we have, then we may get less money. Of course, we may get more money. It's hard to know right now which. And the statute was designed to make sure that creditors got more money rather than less money. And if you talk to me, you can talk about anything as a statutory right if you say, I have a present-day statutory right if the following chain of things happens to have this happen to me. But that, I mean, if you could sort of do that with anything, any future speculative injury, just sort of cast it as a current. If all of this stuff happens, this is what's going to happen. And then that would sort of eliminate the sort of future speculative part of the standing analysis. Equal treatment seems sort of basic. Why is it in there? It is in there. The statute says FDIC shall treat similarly situated creditors similarly. And then it has an exception. And then the Bankruptcy Code has some exceptions too. One relevant part of the exception here is that in order to treat similarly situated creditors differently, FDIC should assure that this is better for the creditors as a whole and that the creditor is not getting less than they would get if there had been a liquidation under Chapter 7 of the Bankruptcy Code. So it is in there. And they're saying, well, the particular way in which it might, and this sort of goes to the rightness point also, but the particular way in which it might be implemented might be different from the Bankruptcy Code. We would submit that the idea of this was that FDIC would do this in a way that would benefit everybody rather than in a way that would harm anybody. Try a hypothetical. Suppose I have a retirement account with a market interest rate, and the government comes in and says, no, you're going to just get 1% per year. And then I come into court and say I'm injured by that. And you say, well, you don't know that the market interest rate would have been greater than 1% per year, so you have no standing. What's different about that hypothetical in this case? I think that there's a few things that could distinguish it. One is that if the likelihood is that the market rate is going to be higher than that, then the sort of value of your holding has changed. I mean, I think if you change the hypothetical and you said the government said you're just going to get 20% per year, then it would seem difficult to say that the entity has standing to challenge that because it seems like they're better off than they would be, and even though there's a hypothetical possibility, at least they should have to wait. And your hypo, I understand it, was constructed in such a way that it's quite clear that your contract right now is worth less than your contract was the day before the government enacted the statute. I guess you could change it to 3% if you want. Well, I mean, as the rate creeps up, it gets harder and harder, and one way that you might draw a line or one thing that would be relevant to drawing a line would be, you know, whether the present economic value of the asset that you have has changed. You know, in the 1% hypothetical, it's pretty clear that if someone said, all right, you can either have market rate or you can have 1%, you know, guarantee, you know, are the prices of those two assets going to be the same? I think it's pretty clear the answer to that is no. The 1% thing is going to be less valuable. Now here, the problem is the theory is not that the present market value of their holdings is different, and there is a market value, you know, these things are bought and sold on the marketplace. If they had alleged that the government had taken an action that so compromised the value of what they held that the market value of it was lower than it had been before, then, you know, that would be a different case. But they haven't even tried to allege that, much less establish it. So that would be the difference between that. And I think that's the same principle that distinguishes the mortgage hypothetical and, you know, the earthquake. So their reliance on Clinton versus New York, for example, how would you distinguish that? Well, so in Clinton versus New York, there was a concrete plan to rely on the benefit conferred by a federal statute. So here, the concrete plan was we're going to pay this amount. And one of the factors that we considered in deciding to pay that amount was we knew we'd be treated equally. Even if you take that as a given, which it's not entirely clear to me that that is a given, I mean, in the Clinton case, you know, what they were saying was, we want to design a transaction around the existence of this tax credit. And the numbers work out for everybody if we have this tax credit. And then if the tax credit drops out, then our deal gets jettisoned. So here, Clinton is before the fact. Here, we're after the fact. And there's a change that can affect future events. Well, it's not so much before or after. I mean, if they had already entered... But they hadn't entered the deal. Right, they hadn't. But my point is simply, in that case, and this ties into the mortgage hypothetical and the earthquake and whatever else. In that case, it was clear that, you know, your ability to do this profitable transaction was compromised by the fact that this sort of important piece of the puzzle was dropping out. And there was no question in that case that... I mean, it was a line item veto. The point of it was to reduce the federal deficit. There's no question that the amount of federal assistance was going down. And they're saying, we wanted to do this deal with the benefit of federal assistance. Now you're saying no federal assistance. And there was even a dispute in that case between the majority and the dissent, whether that was good enough. I recognize that, you know, the score is bound by the majority. But in that case, what you were talking about was the federal government is taking something away that would be of a benefit to this deal that we're trying to engage in. And we're saying, you know, you've prevented us from entering into this deal. Now, if there were facts in that case that said, okay, the deal is going to go through exactly the same way and you're going to get exactly the same amount of money, or at least even that that was like a likely outcome, that case would have been quite different. And what we're talking about here is they haven't even attempted to say... I mean, they're not saying we're not buying bonds anymore because we're so scared of the ordinary liquidation authority. They're not saying, you know, we are buying them, but boy, the prices that, you know, are very different. They're not saying anything like that. And that is really what Clinton of New York was getting, Clinton versus City of New York was getting. All right. Unless there are any other questions. Anything further? Thank you, Your Honor. Thank you. All right. So, we're back to the beginning. Counsel for three plaintiffs, but focusing on the facts. Thank you, Your Honor. I want to briefly address the Financial Stability Oversight Council and then talk about the question of the complaint and the extra plaintiffs. Our standing with respect to the Financial Stability Oversight Council, competitor standing, first, we have established that we are in competition with GE Capital and other cities. The record is sufficient to plausibly establish that. And this court said in the Shirley case that the basic law of economics suggests that if you increase competition, you have injury as a competitor. And so the question is, have we plausibly pled an increase in competition? Now, but for the fact of the additional regulations, I think it would be beyond question. We have Chairman Bernanke saying, when you say, when the government steps up and says, you're too big to fail, you get a subsidy out of that. Chairman Bernanke said it. He said that it changes the competitive claim. I think that the last question for the court to answer is whether the fact that additional regulations now also imposed on the bank somehow has rendered that less plausible. And I want to refer the court to pages 146 and 147 of the Joint Appendix, which is a letter from Senator Sherrod Brown and David Vitter to the Comptroller General January 1st of 2013, in which they refer to sources that go to exactly this question. On JA 146, they quote the Federal Reserve Board Governor Daniel Tarullo, who says, to the extent a growing systemic footprint increases perceptions of at least some residual too-big-to-fail quality in such a firm, notwithstanding the panoply of measures in Dodd-Frank and our regulations, there may be funding advantages for the firm. So saying, despite the fact of the regulations, the too-big-to-fail label provides a subsidy. There may be. Yes, Your Honor. But that is in Louisiana Energy. I'm just reading what you're relying on, all right? Yes, Your Honor. And surely, this court said, no one can say exactly how likely the doctors are to lose funding. In a competitor's standing case, what you need to show is the increase in competition. We don't have to show the exact effect. But on JA 147, they cite additional sources for the principle that credit rating agencies have stated that they will consider the likelihood of government support when determining an institution's credit rating. So here we have two authorities, one, the Federal Reserve Board governor, and another, statements by credit rating agencies themselves that are in the record and that make it very plausible that, indeed, this subsidy will flow to them. So, all right, so you're saying that gets you past the bar. Yes, Your Honor. That is enough for us to plausibly allege that we are facing competitive harm because of this subsidy. And I know- You're facing competition. And does that necessarily mean it's competitive harm? An increase in competition. And this court has recognized- That's what I want to understand. Is an increase in competition necessarily the same as competitive harm? That is what this court's precedents in Shirley, Louisiana Energy- I don't think they quite addressed that. I mean, because they were in the same market, et cetera. But, at any rate, all right. Yes, Your Honor. In liquid carbonic- Would you acknowledge there is a distinction? Between increased competition and competitive harm? Yeah, I mean, I'm a little operator here, and all of a sudden, the Cavanaugh Company comes along, and we're in competition. And, gee, you know, I turn out to be a billion-dollar corporation for four years because this competition has made me better. If there is a distinction, it's not one this court's precedents have ever recognized. So the assumption is if there's competition, there's going to be harm. That's what you're saying the case has said. If the government's action increased the competition, and we had plausibly pled that it has by placing the thumb on the scales on the side of investment in G.E. Capital as a less risky option than it was the day before it was designated the city. The government cited the already LLC versus Nike case from the Supreme Court as maybe dialing back a bit on better standing. Your response to that is? That case is completely an opposite. In that case, there was an agreement in place with respect to the trademark that the Supreme Court found made it completely implausible, that there was no possibility of there being any competitive harm with respect to that same trademark. And the standing theory that already then advanced that, well, even if we don't have a product that is in competition with this particular shoe, we still, because we generally compete in the shoe market, can allege harm. There, the Supreme Court noted, they haven't alleged that there's a particular product in competition. Here we have. And so Nike is an opposite. Judge Kavanaugh, you did ask before about cases in which a benefit to the other side or the government speaking perhaps about our competitor had been deemed to provide standing. I think Tazi is probably one of the better examples where Tazi was selling PVC pipe and there were environmental groups trying to shut them down from being able to do that. And the court found that the government speaking and labeling that pipe a carcinogen, giving that weapon to those environmental groups to be able to go and lobby municipalities to prohibit PVC pipe was sufficient to confer standing on Tazi because of the harm by giving those environmental groups that additional ability to effectively compete in the political sphere against them. The Shays case is similar. There, the government lifted restrictions. The allegation was that ECRA imposed restrictions and that the regulations lifted those. It was pointed out that for Congressman Shays, he had full access to all of those things. He was given additional benefits in the form of being able to compete with additional monies. And they said, you don't weigh those benefits against each other in that way in order to determine standing. He said that he has a right to a certain kind of competitive market and that's sufficient. And finally, I just want to address the, I suppose, the procedural points with respect to which complaint governs for purposes of standing here. I think I've already pointed the court to the precedence, the best precedence, I think, for considering supplemental affidavit submitted after the fact. But I also want to point out it's very common. And in fact, it happened in this case. Additional plaintiffs get added in in a second complaint. If you had to trace standing back to the first complaint for purposes of those, and sometimes that is done when the original plaintiffs have lost standing. And an additional plaintiff is added in. You put all your chickens in the bank basket. Excuse me, Your Honor? You're focusing only on the bank, right? Yes, we have the bank is what I'm arguing about today, Your Honor. But as a matter of jurisprudence. That's a hypothetical different case. It is different. But I'm saying it wouldn't make sense to establish a rule that says we ignore subsequent pleadings for purposes of standing purposes. I mean, just conceptually, don't you typically measure subsequent plaintiffs? The first plaintiff has to have standing in our case. I have a case I'm litigating in the District of Newark right now where the original plaintiff lost standing. And they amended the complaint to add a new plaintiff who could carry the banner forward because they have a high certification ruling that they want to be able to continue with. I didn't find any D.C. circuit cases. And, of course, the parties haven't cited any. And my clerk found some cases, but they're not really... They're close. One's in the Federal Circuit. I think it's correct. You've got to look at the original complaint. We didn't find any cases. We looked. We didn't find any. I can give you some sites if you want to see some cases. But they're not in the brief. First Circuit, please. Yeah, First Circuit, Federal Circuit. Okay. And as to Jennifer's last question about the extra plaintiffs, the government would be free to move for summary judgment against those extra plaintiffs once we get back to rename. And if our extra plaintiffs are not able to make a showing of their standing, they won't be able to proceed. This is simply a question of the motion to dismiss standard that leaves all the plaintiffs but one out. Are there no further questions? Thank you. Thank you. Counsel to the State. Just three very quick points, Your Honors. Just to have you correct, many of these provisions in Title II of Dodd-Frank, in fact, regulate creditors like the states. They're not just aimed at the debtors or the financial companies that are regulated. So when the government argued in its brief and the district court agreed that we are not regulated, in fact, by Title II, that's incorrect. We are. Those provisions define our rights as creditors, our obligations as creditors. Secondly, to my friend's point that we don't yet know sort of the direction or that these provisions in Title II does. What we do know is that the Bankruptcy Code, its purpose is to maximize value of the company for the benefit of the creditors. What we know Title II's purpose to be is to shift these losses away from taxpayers so that creditors and shareholders bear the losses. So we have a very different approach, and that approach is borne out if you look at these provisions, these creditor provisions, the denial of the quality of treatment, the lack of notice to the creditors. Creditors don't get to participate. Creditors have sort of very circumscribed ability to have their claims reviewed. All these provisions in Title II really cut against the creditors in ways that the Bankruptcy Code doesn't. Now, as to the point that the loss of the right to equal treatment should really be sort of minimized, because they can only exercise it if they determine that doing so is to the benefit of the creditors. But this is the same federal government that argued that in the Chrysler situation, that pouring the secured creditors like Indiana's pension fund right out in favor of unsecured creditors like the United Auto Workers was for the benefit of the creditors as a whole, because that maximized the value of old Chrysler in the aggregate. But that nonetheless doesn't mean that it didn't cut directly against Indiana's pension fund in a way that harmed the state of Indiana's pensions. Much in the same respect, we're harmed by loss of guarantees that we've had when we purchased these securities on behalf of our pension funds. Thank you. Thank you. We'll take the case under advisement.
judges: Rogers, Kavanaugh, Pillard